**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CTIA - THE WIRELESS
ASSOCIATION,
        *Plaintiff-Appellant*,

v.

CITY OF BERKELEY, California;
CHRISTINE DANIEL, City Manager of
Berkeley, California, in her official
capacity,
        *Defendants-Appellees.*

No. 16-15141

D.C. No.
3:15-cv-02529-
EMC

OPINION

On Remand From the United States Supreme Court

Filed July 2, 2019

Before:  William A. Fletcher, Morgan Christen,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Friedland

## SUMMARY[*]

### First Amendment

The panel affirmed the district court's denial of CTIA's request for a preliminary injunction that sought to stay enforcement of a City of Berkeley ordinance requiring cell phone retailers to inform prospective cell phone purchasers that carrying a cell phone in certain ways may cause them to exceed Federal Communications Commission guidelines for exposure to radio-frequency radiation.

CTIA challenged the compelled disclosure provision of the ordinance, arguing that it violated the First Amendment and was preempted.

After the panel initially affirmed the district court's denial of CTIA's request for a preliminary injunction, the U.S. Supreme Court granted the CTIA's petition for a writ of certiorari, vacated the opinion, and remanded for further consideration in light of its decision in *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("NIFLA").

In *American Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749 (9th Cir. 2019) (en banc), the en banc court held that *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (holding that the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is "reasonably

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

related" to a substantial government interest, and involves factual and uncontroversial information that relates to the service or product provided), provided the appropriate framework to analyze a First Amendment claim involving compelled commercial speech.

The panel considered CTIA's likelihood of success on its First Amendment claim. The panel held that it would generally apply the intermediate scrutiny test mandated by *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980), in commercial speech cases where the government acts to restrict or prohibit speech, but the *Zauderer* exception to the general rule of *Central Hudson* could apply. The panel held that the governmental interest in furthering public health and safety was sufficient under *Zauderer* as long as it was substantial. The panel also held that *Zauderer* required that the compelled disclosure further some substantial – that is, more than trivial – governmental interest. Applying the *Zauderer* test to the speech compelled by the Berkeley ordinance, the panel held that the text of the compelled disclosure was literally true, Berkeley's required disclosure was uncontroversial within the meaning of NIFLA, and the compelled disclosure was not unduly burdensome. The panel concluded that CTIA had little likelihood of success on its First Amendment claim that the disclosure compelled by the Berkeley ordinance was unconstitutional.

Turning to the issue of federal preemption of Berkeley's ordinance, the panel held that far from conflicting with federal law and policy, the Berkeley ordinance complemented and enforced it. The panel held that Berkeley's compelled disclosure did no more than alert consumers to the safety disclosures that the Federal Communications Commission required, and directed consumers to federally compelled

instructions in their user manuals providing specific information about how to avoid excessive exposure. The panel concluded that CTIA had little likelihood of success based on conflict preemption.

The panel considered the other elements of its preliminary injunction analysis. The panel held that there was no showing of irreparable harm based on CTIA's First Amendment claim, or based on the preemption claim. The panel concluded that the balance of the equities favored Berkeley. The panel further held that the ordinance was in the public interest and that an injunction would harm that interest. The panel concluded that the district court did not abuse its discretion in denying preliminary injunctive relief to CTIA.

Dissenting in part, Judge Friedland wrote that CTIA is likely to succeed on the merits of its First Amendment challenge because Berkeley's ordinance violates the First Amendment by requiring businesses to make false and misleading statements about their own products, and therefore the ordinance should have been preliminarily enjoined.

## COUNSEL

Helgi C. Walker and Theodore B. Olson, Gibson Dunn & Crutcher LLP, Washington, D.C.; Alexander N. Harris, Joshua D. Dick, and Joshua S. Lipshutz, Gibson Dunn & Crutcher LLP, San Francisco, California; for Plaintiff-Appellant.

Lester Lawrence Lessig, III, Cambridge, Massachusetts; Amanda Shanor, New Haven, Connecticut; Jerome Mayer-

Cantu, Deputy City Attorney; Farimah Brown, City Attorney; Berkeley City Attorney's Office, Berkeley, California; for Defendants-Appellees.

## OPINION

W. FLETCHER, Circuit Judge:

A City of Berkeley ordinance requires cell phone retailers to inform prospective cell phone purchasers that carrying a cell phone in certain ways may cause them to exceed Federal Communications Commission guidelines for exposure to radio-frequency radiation. CTIA, a trade association formerly known as Cellular Telephone Industries Association, challenges the ordinance on two grounds. First, it argues that the ordinance violates the First Amendment. Second, it argues that the ordinance is preempted.

CTIA requested a preliminary injunction staying enforcement of the ordinance. The district court denied CTIA's request, and CTIA filed an interlocutory appeal. We affirmed the district court in a published opinion. *See CTIA–The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105 (9th Cir. 2017) ("*CTIA*"). CTIA then filed a petition for writ of certiorari. The Supreme Court granted the petition, vacated our opinion, and remanded for further consideration in light of its decision in *National Institute of Family and Life Advocates v. Becerra*, — U.S. —, 138 S. Ct. 2361 (2018) ("*NIFLA*"). *CTIA–The Wireless Ass'n v. City of Berkeley*, — U.S. —, 138 S. Ct. 2708 (2018) (mem.).

Following remand, our three-judge panel requested supplemental briefing from the parties regarding the effect of

*NIFLA* on CTIA's First Amendment claims.  We waited for an en banc panel of our court to address a similar issue in a separate case.  In *American Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749 (9th Cir. 2019) (en banc) ("*American Beverage*"), the en banc panel "reaffirm[ed] our reasoning and conclusion in *CTIA* that [*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)] provides the appropriate framework to analyze a First Amendment claim involving compelled commercial speech." *Id*. at 756.  In light of our en banc decision in *American Beverage*, and having considered the parties' supplemental briefing on *NIFLA*, we again affirm the district court's decision.  Our amended opinion addresses *NIFLA*'s clarification of the *Zauderer* framework. *See* Section IV.A.1, *infra*.

## I.  Factual and Procedural Background

In May 2015, the City of Berkeley passed an ordinance requiring cell phone retailers to disclose information to prospective cell phone purchasers about the federal government's radio-frequency radiation exposure guidelines relevant to cell phone use.  Under "Findings and Purpose," the ordinance provided:

> A.  Requirements for the testing of cell phones were established by the federal government in 1996.

> B    These requirements established "Specific Absorption Rates" (SAR) for cell phones.

C.  The protocols for testing the SAR for cell phones carried on a person's body assumed that they would be carried a small distance away from the body, e.g., in a holster or belt clip, which was the common practice at that time.  Testing of cell phones under these protocols has generally been conducted based on an assumed separation of 10–15 millimeters.

D.  To protect the safety of their consumers, manufacturers recommend that their cell phones be carried away from the body, or be used in conjunction with hands-free devices.

E.  Consumers are not generally aware of these safety recommendations.

F.  Currently, it is much more common for cell phones to be carried in pockets or other locations rather than holsters or belt clips, resulting in much smaller separation distances than the safety recommendations specify.

G.  Some consumers may change their behavior to better protect themselves and their children if they were aware of these safety recommendations.

H.  While the disclosures and warnings that accompany cell phones generally advise consumers not to wear them against their bodies, e.g., in pockets, waistbands, etc., these

disclosures and warnings are often buried in fine print, are not written in easily understood language, or are accessible only by looking for the information on the device itself.

I. The purpose of this Chapter is to assure that consumers have the information they need to make their own choices about the extent and nature of their exposure to radio-frequency radiation.

Berkeley Mun. Code § 9.96.010 (2015).

CTIA challenged the compelled disclosure provision of the ordinance, arguing that it violated the First Amendment and was preempted. One sentence of the compelled disclosure stated, "The potential risk is greater for children." The district court held that this sentence was preempted, and it issued a preliminary injunction against enforcement of the ordinance. In December 2015, Berkeley re-passed the ordinance without the offending sentence. In its current form, the compelled disclosure provision provides:

A. A Cell phone retailer shall provide to each customer who buys or leases a Cell phone a notice containing the following language:

The City of Berkeley requires that you be provided the following notice:

To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If

you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Mun. Code § 9.96.030(A) (2015).

The ordinance requires that the compelled disclosure be provided either on a prominently displayed poster no less than 8½ by 11 inches with no smaller than 28-point font, or on a handout no less than 5 by 8 inches with no smaller than 18-point font. The logo of the City of Berkeley must be placed on the poster and handout. The ordinance provides that a cell phone retailer may include additional information on the poster or handout if it is clear that the additional information is not part of the compelled disclosure. § 9.96.030(B) ("The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer, as long as that information is distinct from the notice language required by subdivision (A) of this Section.").

CTIA challenged the current ordinance, arguing, as it had before, that the ordinance violates the First Amendment and is preempted. The district court noted that the preempted sentence had been removed from the ordinance, dissolved its previously entered injunction, and denied CTIA's request for a new preliminary injunction. CTIA filed an interlocutory appeal.

## II.  Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1292.  We review a denial of a preliminary injunction for abuse of discretion. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013).  "An abuse of discretion occurs when the district court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (citation and internal quotation marks omitted).  We will not reverse the district court where it "got the law right," even if we "would have arrived at a different result," so long as the district court did not clearly err in its factual determinations.  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc).

## III.  Regulatory Background

The Federal Communications Commission ("FCC") has regulatory jurisdiction over transmitting services in the United States.  In 1996, after extensive consultation with other agencies, the FCC issued a rule designed to limit the Specific Absorption Rate ("SAR") of radio-frequency ("RF") radiation from FCC-regulated transmitters, including cell phones:

> 1. By this action, we are amending our rules to adopt new guidelines and methods for evaluating the environmental effects of *radio-frequency (RF) radiation* from FCC-regulated transmitters.  We are adopting Maximum Permissible Exposure (MPE) limits for electric and magnetic field strength and power

density for transmitters operating at frequencies from 300 kHz to 100 GHz . . . *We are also adopting limits for localized ("partial body") absorption that will apply to certain portable transmitting devices . . . We believe that the guidelines we are adopting will protect the public and workers from exposure to potentially harmful RF fields.*

2. In reaching our decision on the adoption of new RF exposure guidelines we have carefully considered the large number of comments submitted in this proceeding, and particularly those submitted by the U.S. Environmental Protection Agency (EPA), the Food and Drug Administration (FDA) and other federal health and safety agencies. The new guidelines we are adopting are based substantially on the recommendations of those agencies, and *we believe that these guidelines represent a consensus view of the federal agencies responsible for matters relating to the public safety and health.*

In re Guidelines for Evaluating the Environmental Effects of Radio-frequency Radiation, 61 Fed. Reg. 41006, 41006–07 (Aug. 7, 1996) (emphases added).

Out of concern for the safety of cell phone users, the FCC rejected an industry proposal to exclude "low-power devices" such as cell phones from the rule adopting SAR limits:

Most commenting parties, including Federal health and safety agencies, support the use of

the ANSI/IEEE [American National Standards Institute/ Institute of Electrical and Electronic Engineers] SAR limits for localized (partial body) exposure for evaluating low-power devices designed to be used in the immediate vicinity of the body. . . . *Therefore, in view of the consensus and the scientific support in the record, we are adopting the SAR limits for the determination of safe exposure from low-power devices designed to be used in the immediate vicinity of the body* based upon the 1992 ANSI/IEEE guidelines. . . .

The SAR limits we are adopting will generally apply to portable devices . . . that are designed to be used with any part of the radiating structure of the device in direct contact with the body of the user or within 20 cm of the body under normal conditions of use. *For example, this definition would apply to hand-held cellular telephones.* . . .

In re Guidelines for Evaluating the Environmental Effects of Radio-frequency Radiation ("FCC Guidelines for Radio-frequency Radiation"), FCC 96-326, ¶¶ 62–63 (Aug. 1, 1996) (emphases added).

The FCC has a better-safe-than-sorry policy with respect to SAR limits:

. . . The intent of our exposure limits is to provide a cap that both protects the public based on scientific consensus and allows for efficient and practical implementation of

wireless services. The present Commission exposure limit is a "bright-line rule." That is, so long as exposure levels are below a specified limit value, there is no requirement to further reduce exposure. . . . Our current RF exposure guidelines are an example of such regulation, including a significant "safety" factor, whereby the exposure limits are set at a level on the order of 50 times below the level at which adverse biological effects have been observed in laboratory animals as a result of tissue heating resulting from RF exposure.

In re Reassessment of FCC Radiofrequency Exposure Limits and Policies, 28 FCC Rcd. 3498, 3582 (Mar. 29, 2013). The FCC recognizes that its required margin of safety is large:

. . . [E]xceeding the SAR limit does not necessarily imply unsafe operation, nor do lower SAR quantities imply "safer" operation. *The limits were set with a large safety factor*, to be well below a threshold for unacceptable rises in tissue temperature. As a result, exposure well above the specified SAR limit should not create an unsafe condition. . . . In sum, using a device against the body without a spacer will generally result in actual SAR below the maximum SAR tested; moreover, a use that possibly results in non-compliance

with the SAR limit should not be viewed with significantly greater concern than compliant use.

*Id.* at 3588 (emphasis added).

There are two ways to ensure compliance with SAR limits—by reducing the amount of RF radiation from a transmitting device, or by increasing the distance between the device and the user. Different low-power devices emit different amounts of RF radiation, with the result that the minimum distance between the device and the user to achieve compliance with SAR limits varies somewhat from device to device. The FCC requires that cell phone user manuals contain information that alerts users to the minimum distances appropriate for the device they are using:

> *Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum test separation distance requirements.* Users must be fully informed of the operating requirements and restrictions, to the extent that the typical user can easily understand the information, to acquire the required body-worn accessories to maintain compliance. Instructions on how to place and orient a device in body-worn accessories, in accordance with the test results, should also be included in the user instructions. *All supported body-worn accessory operating configurations must be clearly disclosed to users, through conspicuous instructions in the*

*user guide and user manual, to ensure unsupported operations are avoided.*

In re Exposure Procedures and Equipment Authorization Policies for Mobile and Portable Devices, FCC Office of Engineering and Technology Laboratory Division § 4.2.2(d) (Oct. 23, 2015) ("FCC Exposure Procedures") (emphasis added). Compliance with this disclosure requirement is a prerequisite for approval of a transmitting device by the FCC. *See id*. at § 1.

The following are examples of cell phone user manuals that comply with the FCC's disclosure requirement:

Apple:

> iPhone's SAR measurement may exceed the FCC exposure guidelines for body-worn operation if positioned less than 15 mm (5/8 inch) from the body (e.g. when carrying iPhone in your pocket).

*See* iPhone 3G manual, at 7, http://manuals.info.apple.com/ MANUALS/0/MA618/en_US/iPhone_3G_Important_ Product_Information_Guide.pdf.

Samsung:

> If there is a risk from being exposed to radio-frequency energy (RF) from cell phones - and at this point we do not know that there is - it is probably very small. But, if you are concerned about avoiding even potential risks, you can

take a few simple steps to minimize your RF exposure.

• Reduce the amount of time spent using your cell phone;

• Use speaker mode or a headset to place more distance between your head and the cell phone.

*See* Samsung Common Phone Health and Safety and Warranty Guide, at 8, http://www.samsung.com/us/Legal/ PHONE-HS_GUIDE_English.pdf.

LG:

The highest SAR value for this model phone when tested for use at the ear is 1.08 W/Kg (1g) and when worn on the body, as described in this user guide, is 0.95 W/Kg (1g) (body-worn measurements differ among phone models, depending upon available accessories and FCC requirements). While there may be differences between SAR levels of various phones and at various positions, they all meet the government requirement for safe exposure. The FCC has granted an Equipment Authorization for this model phone with all reported SAR levels evaluated as in compliance with the FCC RF emission guidelines. SAR information on this model phone is on file with the FCC and can be found under the Display Grant section

of    http://www.fcc.gov/oet/ea/fccid/    after searching on FCC ID ZNFL15G.

*See* LG Sunrise User Guide, at 93, http://www.lg.com/us/support/manuals-documents.

## IV.  Discussion

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[A] stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, "a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Id.* at 1132 (quoting *Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003)).

### A.  Likelihood of Success

CTIA makes two merits-based arguments against the Berkeley ordinance. First, it argues that the ordinance violates the First Amendment. Second, it argues that the ordinance is preempted. We take the arguments in turn.

## 1. First Amendment

The disclosure underlying Berkeley's ordinance is the disclosure the FCC requires cell phone manufacturers to provide to consumers. However, CTIA has not sued the FCC. Rather, CTIA has sued Berkeley. Berkeley's ordinance requires cell phone retailers to disclose, in summary form, the information to consumers that the FCC already requires cell phone manufacturers to disclose. The Berkeley disclosure directs consumers to user manuals for the specifics of the information required by the FCC.

### a. *Central Hudson* or *Zauderer*

The parties agree that Berkeley's ordinance is a regulation of commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); *see Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011). However, they disagree about whether the ordinance's compliance with the First Amendment should be analyzed under *Central Hudson* or under *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985).

Under *Central Hudson*, the government may restrict or prohibit commercial speech that is neither misleading nor connected to unlawful activity, as long as the governmental interest in regulating the speech is substantial. 477 U.S. at 564. The restriction or prohibition must "directly advance the governmental interest asserted," and must not be "more extensive than is necessary to serve that interest." *Id.* at 566. Under *Zauderer* as we interpret it today, the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is "reasonably related" to a

substantial governmental interest, *Zauderer*, 471 U.S. at 651, and involves "purely factual and uncontroversial information" that relates to the service or product provided. *NIFLA*, 138 S. Ct. at 2372 (quoting *Zauderer*, 471 U.S. at 651).

We apply the intermediate scrutiny test mandated by *Central Hudson* in commercial speech cases where the government acts to restrict or prohibit speech, on the ground that in such cases intermediate scrutiny appropriately protects the interests of both the speaker (the seller) and the audience (the purchaser). But one size does not fit all in commercial speech cases. In *Central Hudson* itself, the Supreme Court cautioned, "The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson*, 477 U.S. at 563.

Five years after *Central Hudson*, the Court held that *Central Hudson*'s intermediate scrutiny test does not apply to compelled, as distinct from restricted or prohibited, commercial speech. In *Zauderer*, defendant Zauderer advertised legal services to prospective Dalkon Shield plaintiffs in a number of Ohio newspapers. The advertisement stated, *inter alia*, "'The cases are handled on a contingent fee basis of the amount recovered. If there is no recovery, no legal fees are owed by our clients.'" *Zauderer*, 471 U.S. at 631. Zauderer was disciplined under Ohio state bar disciplinary rules on the ground that the advertisement was "deceptive" within the meaning of the rules, *id*. at 633, because it failed to disclose "the client's potential liability for costs even if her suit were unsuccessful." *Id.* at 635. The Court noted that the bar disciplinary rules required Zauderer to "include in his advertising purely factual and uncontroversial information about the terms under which his

services will be available." *Id.* at 651. The Court wrote, "Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present." *Id.* at 650. The Supreme Court declined to apply the *Central Hudson* test:

> Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in *not* providing any particular factual information is minimal. . . . We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers.

*Id.* at 651 (internal citation omitted). *See also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 253 (2010) (following *Zauderer* and using its "preventing deception" language).

### b. The *Zauderer* Test

### i. Substantial Governmental Interest

CTIA contends that the *Zauderer* exception to the general rule of *Central Hudson* does not apply in this case because

the speech compelled by the Berkeley ordinance does not prevent deception of consumers. This is the first time we have had occasion in this circuit to squarely address the question whether, in the absence of a prevention-of-deception rationale, the *Zauderer* compelled-disclosure test applies. *Cf. Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) (invalidating compelled disclosure on video game packaging, noting that the disclosure would "arguably now convey a false statement that certain conduct is illegal when it is not, and the State has no legitimate reason to force retailers to affix false information on their products"). Several of our sister circuits, however, have answered this question. They have unanimously concluded that the *Zauderer* exception for compelled speech applies even in circumstances where the disclosure does not protect against deceptive speech.

In *American Meat Institute v. U.S. Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014) (en banc), a Department of Agriculture regulation required identification of the country of origin on the packaging of meat and meat products. *Id.* at 20. The regulation implemented a federal statute requiring country-of-origin labeling. *See* 7 U.S.C. § 1638, 1638a. The D.C. Circuit held that *Zauderer* should not be read to apply only to cases where government-compelled speech prevents or corrects deceptive speech. It noted that on the facts of both *Zauderer* and *Milavetz* (in which the Court repeated *Zauderer*'s "preventing deception" language) there had been deceptive speech: "Given the subject of both cases, it was natural for the Court to express the rule in such terms. The language could have been simply descriptive of the circumstances to which the Court applied its new rule[.]" *Am. Meat*, 760 F.3d at 22. The D.C. Circuit concluded, "The language with which *Zauderer* justified its

approach . . . sweeps far more broadly than the interest in remedying deception." *Id.*

In *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), a Vermont statute required manufacturers of mercury-containing products to label their products and packaging to inform consumers that the products contained mercury and instructing them that the products should be disposed of or recycled as hazardous waste.  *Id.* at 107.   The Second Circuit held that the compelled disclosure was supported by a "substantial state interest in protecting human health and the environment." *Id.* at 115 n. 6.  Citing *Zauderer*, the court recognized that the compelled disclosure did not "prevent 'consumer confusion or deception.'"  *Sorrell*, 272. F.3d at 115.  It nonetheless upheld the disclosure as not "inconsistent with the policies underlying First Amendment protection of commercial speech."  *Id.*  "[M]andated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests." *Id.* at 114; *see also N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009) ("*Zauderer*'s holding was broad enough to encompass nonmisleading disclosure requirements."); *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 556–58 (6th Cir. 2012) (upholding federally required health warnings on cigarette packaging and in cigarette advertisements, relying on the Second Circuit's opinion in *Sorrell*); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005) (noting that the court had found no cases limiting application of the *Zauderer* compelled speech test to prevention or correction of deceptive advertising); *cf. Dwyer v. Cappell*, 762 F.3d 275,

281–82 (3d Cir. 2014) (describing but not relying on *Zauderer*'s preventing-deception criterion).

Our sister circuits have thus held under *Zauderer* that the prevention of consumer deception is not the only governmental interest that may permissibly be furthered by compelled commercial speech. The Supreme Court also signaled its agreement with this reading of *Zauderer*. In *NIFLA*, the Court cited *Zauderer* and other cases to explain that its "precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech,'" 138 S. Ct. at 2372, and that it was "not question[ing] the legality of health and safety warnings, long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *Id*. at 2376.

We therefore hold that the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial. In so holding, we do not foreclose that other substantial interests in other cases may suffice as well. In *American Meat*, the D.C. Circuit declined to decide whether the governmental interest must be substantial, leaving open the question whether a less-than-substantial interest might suffice. *See Am. Meat*, 760 F.3d at 23 ("Because the interest motivating the 2013 [country-of-origin] rule is a substantial one, we need not decide whether a lesser interest could suffice under *Zauderer*."). We answer the question avoided in *American Meat*, holding that *Zauderer* requires that the compelled disclosure further some substantial—that is, more than trivial—governmental interest. *Central Hudson* explicitly requires that a substantial interest be furthered by a challenged regulation prohibiting or restricting commercial speech, and we see nothing in

*Zauderer* that would allow a lesser interest to justify compelled commercial speech. To use the words of the Second Circuit in *Sorrell*, the interest at stake must be more than the satisfaction of mere "consumer curiosity." *Sorrell*, 272 F.3d at 115 n.6; *see also Am. Meat*, 760 F.3d at 23 ("Country-of-origin information has an historical pedigree that lifts it well beyond 'idle curiosity.'"). To use the words of the Supreme Court, "Disclosures must remedy a harm that is 'potentially real not purely hypothetical[.]'" *NIFLA*, 138 S. Ct. at 2367 (quoting *Ibanez v. Fla. Dep't of Bus. & Prof'l. Regulation*, 512 U.S. 136, 146 (1994)).

ii. Purely Factual and Uncontroversial Information

The Court in *Zauderer* noted that the compelled disclosure in that case was of "purely factual and uncontroversial information." *Zauderer*, 471 U.S. at 651. But the Court did not explicitly require in its constitutional test that the disclosed information be "purely factual and uncontroversial." In *NIFLA,* however, the Court held that the *Zauderer* standard did not apply to one of two government-mandated notices at issue in that case because it was "not limited to 'purely factual and uncontroversial information about the terms under which . . . services will be available.'" 138 S. Ct. at 2372 (quoting *Zauderer*, 471 U.S. at 651) (omission in original). *NIFLA* thus stands for the proposition that the *Zauderer* standard applies only if the compelled disclosure involves "purely factual and uncontroversial" information.

*NIFLA* elaborated on *Zauderer*'s "purely factual and uncontroversial" criteria in two respects.

First, the Court held in *NIFLA* that the required information about state-provided abortion services was controversial. The question in *NIFLA* was whether California could require clinics that did not provide abortion services to post a notice giving factual information about state-provided services, including abortion, offered elsewhere. The Court wrote, "[The State] requires these clinics to disclose information about *state*-sponsored services—including abortion, anything but an 'uncontroversial' topic." *Id*. at 2372 (emphasis in original). We do not read the Court as saying broadly that any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial. The dispute in *NIFLA* was whether the state could require a clinic whose primary purpose was to oppose abortion to provide information about "state-sponsored services," including abortion. While factual, the compelled statement took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission. Under these circumstances, the compelled notice was deemed controversial within the meaning of *Zauderer* and *NIFLA*.

Second, the Court in NIFLA required that the compelled speech relate to the product or service that is provided by an entity subject to the requirement. Thus, in addition to holding that clinics could not be required to post the notice because it was controversial, the Court struck down the requirement that clinics post information about services they did not provide. *Id*.

## c.  Application of *Zauderer* Test

Under *Zauderer*, compelled disclosure of commercial speech complies with the First Amendment if the information

in the disclosure is reasonably related to a substantial governmental interest and is purely factual and uncontroversial. The question before us is whether the speech compelled by the Berkeley ordinance satisfies this test.

i. Reasonably Related to a Substantial Governmental Interest

There is no question that protecting the health and safety of consumers is a substantial governmental interest. *See*, *e.g.*, *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341 (1986) ("[H]ealth, safety, and welfare constitute[] a 'substantial' governmental interest"). The federal government and Berkeley have both sought to further that interest. By adopting SAR limits on exposure to RF radiation, the FCC has furthered the interest of protecting the health and safety of cell phone users in the United States. It has done so by adopting a highly protective policy, setting low SAR limits on RF radiation and compelling cell phone manufacturers to disclose information to cell phone users that will allow them to avoid exceeding those limits. By passing its ordinance, the City of Berkeley furthers that same interest. After finding that cell phone users are largely unaware of the FCC policy and of the information in their user manuals, the Berkeley City Council decided to compel retailers in Berkeley to provide, in summary form, the same information that the FCC already requires cell phone manufacturers to provide to those same consumers, and to direct those consumers to consult their user manuals for more detailed information. *See* Jensen Decl., Ex. A (survey) (reflecting that a majority of persons surveyed were not "aware that the government's radiation tests to assure the safety of cell phones assume that a cell phone would not be carried against

your body, but would instead be held at least 1 to 15 millimeters from your body").

CTIA argues strenuously that radio-frequency radiation from cell phones has not been proven dangerous to consumers. Limiting itself to research published when the record was made in this case, CTIA is correct in pointing out that there was nothing then before the district court showing that such radiation had been proven dangerous. But this is beside the point. The fact that RF radiation from cell phones had not been proven dangerous was well known to the FCC in 1996 when it adopted SAR limits to RF radiation; was well known in 2013 when it refused to exclude cell phones from its rule adopting SAR limits; and was well known in 2015 when it required cell phone manufacturers to tell consumers how to avoid exceeding SAR limits. After extensive consultation with federal agencies with expertise about the health effects of radio-frequency radiation, the FCC decided, despite the lack of proof of dangerousness, that the best policy was to adopt SAR limits with a large margin of safety.

The FCC concluded that requiring cell phone manufacturers to inform consumers in their users manuals of SAR limits on RF radiation, and to tell them how to avoid excessive exposure, furthered the federal government's interest in protecting their health and safety. The City of Berkeley concluded that consumers were largely unaware of the contents of their users manuals. Agreeing with the FCC that the information about SAR limits and methods of avoiding excessive exposure is important, Berkeley requires cell phone retailers to provide some of that same information to consumers and to direct them to their user manuals for further details. We are not in a position to disagree with the conclusions of FCC and Berkeley that this compelled

disclosure is "reasonably related" to protection of the health and safety of consumers.

### ii. Purely Factual and Uncontroversial

CTIA argues that Berkeley's compelled disclosure is not "purely factual" within the meaning of *Zauderer*. We disagree.

For the convenience of the reader, we again provide the full text of the compelled disclosure:

> The City of Berkeley requires that you be provided the following notice:
>
>> To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or user manual for information about how to use your phone safely.

Berkeley Mun. Code § 9.96.030(A) (2015).

The text of the compelled disclosure is literally true. We take it sentence by sentence:

(1) "To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines." This statement is true. As recounted above, beginning in 1996 the federal government has set RF exposure guidelines with which cell phones must comply.

(2) "If you carry or use your cell phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation." This statement is also true. The FCC has established SAR limits for RF radiation premised on maintaining a certain separation between a cell phone and the user's body. Maintaining that separation protects consumers from exceeding the SAR limits.

(3) "Refer to the instructions in your phone or user manual for information about how to use your phone safely." This sentence is an instruction rather than a direct factual statement. However, it clearly implies a factual statement that "information about how to use your phone safely" in compliance with the FCC's RF "exposure guidelines" "to assure safety," may be found either in a cell phone or user manual. This implied statement, too, is true.

We recognize, of course, that a statement may be literally true but nonetheless misleading and, in that sense, untrue. That is what CTIA argues here. CTIA argues that the compelled disclosure is inflammatory and misleading, and that it is therefore not "purely factual." CTIA bases its argument solely on the text of the ordinance.

CTIA argues that "[t]he Ordinance requires an inflammatory warning about unfounded safety risks"; that "[t]he Ordinance clearly and deliberately suggests that the federal RF energy testing guideline (the SAR limit) is the demarcation point of 'safety' for cell phones, such that 'exposure' to RF energy above that limit creates a safety hazard"; and that "[t]he Ordinance is misleading for the additional reason that it uses the inflammatory term 'radiation,' which is fraught with negative associations, in order to stoke consumer anxiety." CTIA argues further that the phrase "RF radiation" is "fraught with negative associations," that it is used in the compelled disclosure "in order to stoke consumer anxiety," and that it is therefore not "purely factual."

We read the text differently. The first sentence tells consumers that cell phones are required to meet federal "RF exposure guidelines" in order "[t]o assure safety." Far from inflammatory, this statement is largely reassuring. It assures consumers that the cell phones they are about to buy or lease meet federally imposed safety guidelines.

The second sentence tells consumers what to do in order to avoid exceeding federal guidelines. This statement may not be reassuring, but it is hardly inflammatory. It provides in summary form information that the FCC has concluded that consumers should know in order to ensure their safety. Indeed, the FCC specifically requires cell phone manufacturers to provide this information to consumers. *See* "FCC Exposure Procedures" § 4.2.2(d) ("Specific information must be included in the operating manuals to enable users to select body-worn accessories that meet the minimum *test separation distance* requirements. . . . All supported body-worn accessory operating configurations

must be clearly disclosed to users, *through conspicuous instructions in the user guide and user manual*, to ensure unsupported operations are avoided.") (emphasis added).

The third sentence tells consumers to consult their user manuals to obtain further information—that is, to obtain the very information the FCC requires cell phone manufacturers to provide in "conspicuous instructions" in user manuals.

Further, the phrase "RF radiation," used in the second sentence, is precisely the phrase the FCC has used, beginning in 1996, to refer to radio-frequency emissions from cell phones. *See* FCC Guidelines for Radio frequency Radiation at ¶ 1, *supra* at 6 ("radio-frequency (RF) radiation"). We do not fault Berkeley for using the term "RF radiation" to refer to cell phone emissions when it is not only the technically correct term, but also the term the FCC itself uses to refer to such emissions.

Finally, we note that the Berkeley ordinance allows a cell phone retailer to add to the compelled disclosure. If a retailer is concerned, as CTIA contends it should be, that the term "RF radiation" is inflammatory and misleading, the retailer may add to the compelled disclosure any further statement it sees fit to add. *See* § 9.96.030(B) ("The paper on which the notice is printed may contain other information in the discretion of the Cell phone retailer[.]"). CTIA has put nothing in the record to indicate that any Berkeley retailer has felt it necessary, or even useful, to add explanatory information about the nature of RF radiation. Nor has CTIA presented any evidence in the district court showing how Berkeley consumers have understood the compelled disclosure, or evidence showing that sales of cell phones in

Berkeley were, or are likely to be, depressed as a result of the compelled disclosure.

In its supplemental briefing, CTIA presses its argument that Berkeley's compelled disclosure is controversial. Specifically, CTIA argues that the disclosure is controversial because, in its view, it is misleading rather than factual. Because we have determined that the disclosure is factual and not misleading, we reject CTIA's argument that the disclosure is controversial.

Notably, CTIA does not argue that Berkeley's compelled disclosure is controversial as a result of disagreement about whether radio-frequency radiation can be dangerous to cell phone users. We agree with CTIA's tacit admission that the required disclosure is not controversial on that account. We recognize that there is a controversy concerning whether radio-frequency radiation from cell phones can be dangerous if the phones are kept too close to a user's body over a sustained period. CTIA stoutly maintains that cell phones present no danger whatsoever; the FCC, on the other hand, has determined that cell phone users should be cautioned to store their cell phones at a certain distance from their bodies in order to avert any possible danger. Despite this disagreement, Berkeley's required disclosure is uncontroversial within the meaning of *NIFLA*. It does not force cell phone retailers to take sides in a heated political controversy. The FCC's required disclosure is no more and no less than a safety warning, and Berkeley's required disclosure is a short-hand description of the warning the FCC already requires cell phone manufacturers to include in their user manuals. *See NIFLA*, 138 S. Ct. at 2376 ("[W]e do not question the legality of health and safety warnings long considered permissible[.]").

CTIA also argues that *Zauderer* does not apply because the disclosure "has nothing to do with the terms upon which cell phones are offered[.]"  But *NIFLA* plainly contemplates applying *Zauderer* to "purely factual and uncontroversial disclosures *about commercial products*."  *NIFLA*, 138 S. Ct. at 2376 (emphasis added).  Berkeley's ordinance falls squarely within this category.  It requires cell phone retailers to disclose information to prospective cell phone purchasers about what the FCC has concluded is appropriate use of the product they are about to buy.

### d.  Unduly Burdensome

Finally, CTIA argues that Berkeley's compelled disclosure is unconstitutional under *Zauderer* because it is "unduly burdensome."  *NIFLA*, 138 S. Ct. at 2377 (quoting *Zauderer*, 471 U.S. at 651).  In *American Beverage*, we considered en banc a similar challenge to a San Francisco ordinance requiring health warnings on some advertisements for certain sugar-sweetened beverages.  The San Francisco ordinance included "a requirement that the warning occupy at least 20% of the advertisement and be set off with a rectangular border."  *American Beverage*, 916 F.3d at 754 (quoting City & Cty. of S.F., Cal., Health Code art. 42, div. I, § 4203(b)).  We concluded that San Francisco had not met its burden of showing that the warning "does not 'drown out' Plaintiffs' messages and 'effectively rule[] out the possibility of having [an advertisement] in the first place."  *Id*. at 757 (quoting *NIFLA*, 138 S. Ct. at 2378).  We thus held that the 20% requirement was "unduly burdensome when balanced against its likely burden on protected speech."  Berkeley's ordinance, in contrast, does not unduly burden speech.  As noted above, the ordinance may be satisfied by a single 8.5 x 11" posted notice or 5 x 8" handout to which the retailer may

add additional information so long as that information is distinct from the compelled disclosure. This minimal requirement does not interfere with advertising or threaten to drown out messaging by the cell phone retailers subject to the requirement.

### e. Likelihood of Success

Based on the foregoing, we conclude that CTIA has little likelihood of success on its First Amendment claim that the disclosure compelled by the Berkeley ordinance is unconstitutional.

### 2. Preemption

### a. Conflict Preemption

"Federal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in the legislative field." *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (internal quotation marks omitted). CTIA contends that Berkeley's compelled disclosure is invalid because of conflict preemption.

"Conflict preemption is implicit preemption of state law that occurs where there is an actual conflict between state and federal law." *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (citations and internal quotation marks omitted). "When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine

how best to prioritize those objectives. Allowing a state law to impose a different standard [impermissibly] permits a re-balancing of those objectives." *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010). Conflict preemption arises either when "compliance with both federal and state regulations is a physical impossibility . . . or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *McClellan*, 776 F.3d at 1039 (citations and internal quotation marks omitted). We are concerned here with "obstacle" preemption. CTIA contends that Berkeley's compelled disclosure creates an impermissible obstacle by requiring more disclosure than is required by the FCC. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (finding preemption where a challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (internal quotation marks omitted).

### b. Telecommunications Act of 1996

"Preemption analysis 'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *City of Columbus v. Ours Garage and Wrecker Serv., Inc.*, 536 U.S. 424, 438 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "Congressional intent, therefore, is the ultimate touchstone of preemption analysis." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040 (9th Cir. 2007) (citing *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000)).

The FCC's organic statute is the Telecommunications Act of 1996 ("the Act"), 110 Stat. 56. Legislative hearings, as

well as the Act itself, show that Congress desired "uniform, consistent requirements, with adequate safeguards of public health and safety" in nationwide telecom services. *See* H.R. Rep. No. 104-204, 94 (1996). The Act delegated to the FCC the authority "to 'make effective rules regarding the environmental effects of [RF] emissions.'" *Farina v. Nokia Inc.*, 625 F.3d 97, 106 (3d Cir. 2010) (quoting 110 Stat. 56, 152). Specifically, "the FCC was tasked not only with protecting the health and safety of the public, but also with ensuring the rapid development of an efficient and uniform network[.]" *Id.* at 125. This led to the creation of the regulatory measures described *supra*.

The centerpiece of CTIA's argument is that the FCC does not compel cell phone manufacturers to provide information to consumers about SAR limits on RF radiation exposure. CTIA did not make this argument in the district court. Indeed, it conceded in its briefing in the district court that the FCC did so require. *See*, *e.g.*, Plaintiff's Reply in Support of Motion for a Preliminary Injunction at 12 ("The manner in which Berkeley requires CTIA's members to deliver Berkeley's message—at the point of sale, rather than in a user manual—also distinguishes the Ordinance from *the FCC's requirements*.") (emphasis added). CTIA made this argument for the first time in its Reply Brief in this court, and it repeated the argument during oral argument to our panel.

Because CTIA conceded the point in the district court and made its argument to the contrary only before us (and even then only in its Reply Brief and during oral argument), it is waived. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("This issue is raised for the first time on appeal, and we therefore treat the issue as waived."); *United States v. Bohn*, 956 F.2d 208,

209 (9th Cir. 1992) ("we ordinarily decline to consider arguments raised for the first time in a reply brief"). But we note that if we were to consider CTIA's argument on the merits, we would reject it. Beginning in October 2015, the FCC required cell phone manufacturers to inform consumers of minimum separation distances in user manuals. We quoted the relevant passage, *supra* at 14–15. For the convenience of the reader, we repeat much of the passage here:

> Specific information *must be included* in the operating manuals to enable users to select body-worn accessories that meet the minimum test separation distance requirements. Users *must be fully informed* of the operating requirements and restrictions, to the extent that the typical user can easily understand this information, to acquire the required body-worn accessories to maintain compliance. . . . All supported body-worn accessory operating configurations *must be clearly disclosed* to users, through conspicuous instructions in the user guide and user manual, to ensure unsupported operations are avoided.

In re Exposure Procedures and Equipment Authorization Policies for Mobile and Portable Devices, FCC Office of Engineering and Technology Laboratory Division § 4.2.2(d) at 11 (Oct. 23, 2015) ("FCC Exposure Procedures") (emphases added). The FCC document containing this language "is one of a collection of guidance publications referred to as the *published RF exposure KDB procedures*." *Id.* § 1 at 1 (emphasis in original). The document specifies that "[a]pplications for equipment authorization must meet all

the requirements described in the applicable *published RF exposure KDB procedures*." *Id.* § 2 at 3 (emphasis in original). That is, in order for a cell phone to be authorized by the FCC for consumer use, it must satisfy the requirements outlined in FCC Exposure Procedures.

### c. Likelihood of Success

Given the FCC's requirement that cell phone manufacturers must inform consumers of "minimum test separation distance requirements," and must "clearly disclose[ ]" accessory operating configurations "through conspicuous instructions in the user guide and user manual, to ensure unsupported operations are avoided," we see little likelihood of success based on conflict preemption. Berkeley's compelled disclosure does no more than alert consumers to the safety disclosures that the FCC requires, and direct consumers to federally compelled instructions in their user manuals providing specific information about how to avoid excessive exposure. Far from conflicting with federal law and policy, the Berkeley ordinance complements and reinforces it.

### B. Irreparable Harm

Irreparable harm is relatively easy to establish in a First Amendment case. "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 973 (9th Cir. 2002) (citation omitted), *abrogated on other grounds by Winter v. Nat. Res. Def. Council.*, 555 U.S. 7, 22 (2008). We nonetheless conclude that it has not been established here.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  But the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury.  It is the "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes." *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984).  We have already concluded under the *Zauderer* test for compelled disclosure that, on the record before us, Berkeley's ordinance complies with the First Amendment. *Sammartano*, 303 F.3d at 973–74 ("[T]he test for granting a preliminary injunction is 'a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness,' when the harm claimed is a serious infringement on core expressive freedoms, a plaintiff is entitled to an injunction even on a lesser showing of meritoriousness.").  Further, there is nothing in the record showing harm to CTIA or its members through actual or threatened reduction in sales of cell phones caused by the disclosure compelled by the ordinance.

We conclude similarly that there has been no showing of irreparable harm based on preemption.

## C. Balance of the Equities

A court must "balance the interests of all parties and weigh the damage to each" in determining the balance of the equities. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

CTIA asserts that implementing the ordinance will cause its members substantial economic harm and violate their First Amendment rights. We have concluded that CTIA's First Amendment claim is unlikely to succeed, and the record provides no evidence to support a finding of economic or reputational harm to cell phone retailers. However, CTIA relies on *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 15–16 (1986), to argue that, while disclosures may not violate the First Amendment, the ordinance imposes an "undue burden" on CTIA's members because it creates significant "pressure to respond," and that this pressure is "antithetical to the free discussion that the First Amendment seeks to foster." There is no showing of any such pressure. The ordinance requires CTIA's members to inform their customers that the FCC has promulgated regulations concerning RF emissions and to advise customers to refer to their user manuals for more information. To the extent a cell phone retailer is dissatisfied with the disclosure as written, it can append additional disclosures. Berkeley Ordinance, § 9.96.030(C) ( May 26, 2015). CTIA has put nothing in the record showing that any Berkeley cell phone retailer has felt pressured, or has sought to take advantage of the provision of the ordinance allowing it to make any additional disclosure it desires. *See also Milavetz,* 559 U.S. at 250 ("not preventing . . . [the] convey[ance] of any additional information" is one of the essential features of a *Zauderer* disclosure).

Berkeley properly asserts that it has a substantial interest in protecting the health of its citizens. CTIA, on the other hand, has failed to demonstrate any hardship tipping the balance in its favor. We conclude that the balance of the equities favors Berkeley.

### D.  The Public Interest

"The public interest inquiry primarily addresses impact on non-parties rather than parties.  It embodies the Supreme Court's direction that[,] in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Bernhardt v. L.A. Cty.*, 339 F.3d 920, 931–32 (9th Cir. 2003) (internal quotation marks and citation omitted) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  We agree with the district court that an injunction would injure the public interest in having a free flow of accurate information.

"Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal." *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114.  The district court found that while "'accurate and balanced disclosures regarding RF energy are already available' . . . there is evidence that the public does not know about those disclosures."  Because "disclosure furthers, rather than hinders . . . the efficiency of the 'marketplace of ideas,'" we hold that the ordinance is in the public interest and that an injunction would harm that interest.  *See Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 114.

### Conclusion

Our assessment of the probability of CTIA's success on the merits, the likelihood of irreparable harm, the balance of the hardships, and the public interest lead us to conclude that the district court did not abuse its discretion in denying

preliminary injunctive relief to CTIA. Accordingly, the district court's order denying such relief is

**AFFIRMED.**

---

FRIEDLAND, Circuit Judge, dissenting in part:

The majority interprets the sentences in Berkeley's forced disclosure statement one at a time and holds that each is "literally true." But consumers would not read those sentences in isolation the way the majority does. Taken as a whole, the most natural reading of the disclosure warns that carrying a cell phone in one's pocket is unsafe. Yet Berkeley has not attempted to argue, let alone to prove, that message is true.

It is clear that the First Amendment prevents the government from requiring businesses to make false or misleading statements about their own products. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009), *aff'd sub nom. Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011). Because—at least on the current record—that is what Berkeley's ordinance would do, I believe the ordinance violates the First Amendment and therefore should have been preliminarily enjoined.[1] *See Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) ("Both this court and the Supreme Court have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

---

[1] I agree with the majority's preemption analysis so dissent only from sections IV.A.1., IV.B., IV.C., and IV.D. of the majority opinion.

irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

## I

Berkeley's ordinance requires stores selling cell phones to provide a disclosure stating:

> To assure safety, the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines. If you carry or use your phone in a pants or shirt pocket or tucked into a bra when the phone is ON and connected to a wireless network, you may exceed the federal guidelines for exposure to RF radiation. Refer to the instructions in your phone or use manual for information about how to use your phone safely.

Berkeley Mun. Code § 9.96.030(A) (2015).

The majority parses these sentences individually and concludes that each is "literally true." In my view, this approach misses the forest for the trees. On its face, the disclosure begins and ends with references to safety, plainly conveying that the intervening language describes something unsafe. Indeed, the disclosure directs consumers to their user manuals for instructions on "how to use your phone safely." The message of the disclosure as a whole is clear: carrying a phone "in a pants or shirt pocket or tucked into a bra" is *not* safe. Yet that implication is a problem for Berkeley because it has not offered any evidence that carrying a cell phone in a pocket is in fact unsafe. Instead, it has expressly denied that the required disclosure conveys that message. I disagree.

Berkeley insists the ordinance "rests exclusively upon existing FCC regulations." But those regulations communicate something far different than does the ordinance. The FCC guidelines make clear that they are designed to incorporate a many-fold safety factor, such that exposure to radiation in excess of the guideline level is considered by the FCC to be safe:

> Our current RF exposure guidelines . . . include[e] a significant "safety" factor, whereby the exposure limits are set at a level on the order of 50 times below the level at which adverse biological effects have been observed in laboratory animals as a result of tissue heating resulting from RF exposure. This "safety" factor can well accommodate a variety of variables such as different physical characteristics and individual sensitivities — and even the potential for exposures to occur in excess of our limits *without posing a health hazard to humans*.

In re Reassessment of FCC Radiofrequency Exposure Limits and Policies, 28 FCC Rcd. 3498, 3582 (Mar. 29, 2013) (emphasis added). There is thus no evidence in the record that the message conveyed by the ordinance is true.[2]

---

[2] Because even under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), any forced disclosure statement must be truthful, *see id.* at 651; *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc), I do not think that any discussion of the scope of *Zauderer*'s applicability is necessary in this case. Were I writing on a blank slate about that issue, however, I would conclude that *Zauderer* applies only when the government compels a truthful disclosure to counter a false or misleading advertisement. Given that the disclosure

## II

The First Amendment clearly does not permit the government to force businesses to make false or misleading statements about their products. In *Video Software Dealers*, we considered a challenge to a California law requiring that "violent" video games be labeled with a sticker that said "18" and preventing the sale or rental of violent video games to minors. 556 F.3d at 953–54. After striking down the law's sale and rental prohibition, we concluded that continuing to require the label "18" "would arguably . . . convey a false statement" that minors could not buy or rent the video game, and was therefore unconstitutional. *Id.* at 965–67. The same principle applies here: the First Amendment prohibits Berkeley from compelling retailers to communicate a misleading message. I would thus hold that CTIA is likely to succeed on the merits of its First Amendment challenge.

There are downsides to false, misleading, or unsubstantiated product warnings. Psychological and other social science research suggests that overuse may cause people to pay less attention to warnings generally: "[A]s the number of warnings grows and the prevalence of warnings

---

in *Zauderer* itself prevented an advertisement from being misleading, I have serious doubt that the Supreme Court intended the *Zauderer* test to apply in broader circumstances. *See Zauderer*, 471 U.S. at 651 ("[W]e hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."). Although our en banc decision in *American Beverage* held that *Zauderer* is not so limited, *see* 916 F.3d at 756, I agree with Judge Nguyen's statement in her separate concurrence there that "[t]he Supreme Court recently had the opportunity to expand *Zauderer*'s application beyond deceptive speech but declined to do so." *Id.* at 768 (Nguyen, J., concurring in the judgment).

about low level risks increases, people will increasingly ignore or disregard them." J. Paul Frantz et al., *Potential Problems Associated with Overusing Warnings*, Proceedings of the Human Factors & Ergonomics Soc'y 43rd Ann. Meeting 916, 916 (1999). Relatedly, "[w]arnings about very minor risks or risks that are extremely remote have raised concerns about negative effects on the believability and credibility of warnings. . . . In essence, such warnings represent apparent false alarms as they appear to be 'crying wolf.'" *Id.* at 918; *see also* David W. Stewart & Ingrid M. Martin, *Intended and Unintended Consequences of Warning Messages: A Review and Synthesis of Empirical Research*, 13 J. Pub. Pol'y & Marketing 1, 7 (1994). If Berkeley wants consumers to listen to its warnings, it should stay quiet until it is prepared to present evidence of a wolf.