**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1684

STEVEN M. RECHT; ALESHA BAILEY; STEPHEN P. NEW,

       Plaintiffs – Appellees,

v.

PATRICK MORRISEY, in his capacity as Attorney General of the State of West Virginia,

       Defendant – Appellant,

and

JIM JUSTICE, in his official capacity as Governor of West Virginia,

       Defendant.

------------------------------

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; ALLIANCE FOR PATIENT ACCESS; WEST VIRGINIA STATE MEDICAL ASSOCIATION,

       Amici Supporting Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. John Preston Bailey, District Judge. (5:20-cv-00090-JPB)

Argued: March 10, 2022                          Decided: April 27, 2022

Before WILKINSON and DIAZ, Circuit Judges, and FLOYD, Senior Circuit Judge

---

Reversed and remanded with directions to dismiss by published opinion. Judge Wilkinson wrote the opinion, in which Judge Diaz and Senior Judge Floyd joined.

---

**ARGUED:** Lindsay Sara See, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant. Elbert Lin, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Amicus Curiae. Robert S. Peck, CENTER FOR CONSTITUTIONAL LITIGATION, PC, Washington, D.C., for Appellees. **ON BRIEF:** Patrick Morrisey, Attorney General, Curtis R.A. Capehart, Deputy Attorney General, Caleb A. Seckman, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant. Scott S. Segal, Robin Jean Davis, THE SEGAL LAW FIRM A LEGAL CORPORATION, Charleston, West Virginia, for Appellees. J. Mark Adkins, BOWLES RICE LLP, Charleston, West Virginia, for Amici The Alliance for Patient Access and West Virginia State Medical Association. Andrew R. Varcoe, Stephanie A. Maloney, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C.; J. Pierce Lamberson, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Amicus Chamber of Commerce of the United States of America.

---

WILKINSON, Circuit Judge:

West Virginia by statute regulates legal advertisements that solicit clients in litigation involving medications or medical devices. The plaintiffs in this case, two West Virginia attorneys and a client, contend that the statute violates the First Amendment by prohibiting attorneys from using certain terms or images in their advertisements and by requiring such advertisements to include certain disclosures. The district court agreed, granting summary judgment to the plaintiffs.

We now reverse the district court and uphold West Virginia's law. This statute lies right at the heart of West Virginia's police power. If West Virginia has one premier duty, it is to safeguard the health and safety of its citizens. And while the State certainly may not abridge basic constitutional protections in exercising that police power, the Supreme Court has long made clear that the regulation of commercial speech invokes lessened First Amendment concerns. In this area, we accord the State some, though not infinite, leeway in balancing the important state interests against the individual rights involved.

The district court did not afford the State that leeway. It applied strict scrutiny to the statute's prohibitions, even though regulations of commercial speech have long received intermediate scrutiny. And while the district court correctly noted that an even more deferential standard applies to the statute's disclosure requirements, it gave the State little deference when it applied that standard. Applying the correct standards with appropriate deference, we hold that the statute does not violate the First Amendment, and that the case must therefore be dismissed.

I.

A.

In March 2020, West Virginia passed the Prevention of Deceptive Lawsuit Advertising and Solicitation Practices Regarding the Use of Medications Act. *See* W. Va. Code §§ 47-28-1 *et seq*. The Act is designed to regulate legal advertisements, i.e. the ads that attorneys use to solicit plaintiffs in litigation stemming from the use of medications or medical devices. It serves to ensure that such advertisements do not mislead or confuse the public.

The statute applies to advertisements that constitute "a solicitation for legal services regarding the use of medications through television, radio, newspaper or other periodical, outdoor display, or other written, electronic, or recorded communications wherein the advertisement solicits clients or potential clients for legal services." *Id.* § 47-28-2(1). The statute regulates such advertisements in two ways: by prohibiting certain terms or images that may mislead the public, and by requiring certain disclosures to prevent confusion and protect public health.

The Act's prohibitions target attorney advertisements that give the false impression that they reflect medical or governmental advice. So the statute prohibits attorneys from "[p]resent[ing]" an advertisement as a "consumer medical alert," "health alert," "consumer alert," or "public service health announcement" so as to suggest "to a reasonable recipient that the advertisement is offering professional, medical, or government agency advice about pharmaceuticals or medical devices rather than legal services." *Id.* § 47-28-3(a)(2). Similarly, an advertisement may not display "the logo of a federal or state government

4

agency in a manner that suggests affiliation with the sponsorship of that agency." *Id.* § 47-28-3(a)(3). And a third prohibition operates to make sure that attorney advertisements do not provide misleading information about the status of medications by preventing advertisements from using "the word 'recall' when referring to a product that has not been recalled by a government agency or through an agreement between a manufacturer and government agency." *Id.* § 47-28-3(a)(4).

The Act's disclosure requirements likewise aim to prevent attorney advertisements from confusing or misleading the audience. Several disclosure requirements, which plaintiffs do not challenge here, serve to make clear that attorney advertisements are just that—attorney advertisements. For instance, advertisements must state that they are "a paid advertisement for legal services," must identify their sponsor, and must indicate the identity of the attorney or law firm that would represent clients. *Id.* § 47-28-3(a)(1), (5), (6).

Two other disclosure requirements, which plaintiffs do challenge, ensure that attorney advertisements do not give patients the mistaken impression that they should suddenly stop using prescription drugs or medical devices. These requirements apply only to advertisements made "in connection with a prescription drug or medical device approved by the U.S. Food and Drug Administration." *Id.* § 47-28-3(b)(1), (b)(2). Such advertisements must include the warning: "Do not stop taking a prescribed medication without first consulting with your doctor. Discontinuing a prescribed medication without your doctor's advice can result in injury or death." *Id.* § 47-28-3(b)(1). They must also "disclose that the subject of the legal advertisement remains approved by the U.S. Food

5

and Drug Administration, unless the product has been recalled or withdrawn." *Id.* § 47-28-3(b)(2).

Any person who "willfully and knowingly" violates the Act is deemed to have engaged in an unfair or deceptive act or practice in violation of the West Virginia Consumer Credit and Protection Act. *Id.* § 47-28-3(d).

B.

In May 2020, two personal injury attorneys, Steven M. Recht and Stephen P. New, as well as one of New's clients, Alesha Bailey, filed suit against the Attorney General of West Virginia. They alleged that the Act was unconstitutional and sought injunctive and declaratory relief under 42 U.S.C. § 1983.

Following discovery, plaintiffs moved for summary judgment on the grounds that the Act violated the First Amendment. The district court granted that motion. It first determined that the Act imposed "a specific content-based burden on protected expression." J.A. 225. While West Virginia contended that strict scrutiny was inapplicable, the district court found this argument "to be foreclosed" in light of *Barr v. American Ass'n of Political Consultants*, 140 S. Ct. 2335 (2020). J.A. 227 (also quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) ("A law that is content based on its face is subject to strict scrutiny.")). It therefore decided to "apply strict scrutiny, but note[d] that even were the Court to apply intermediate scrutiny, the [Act's] restrictions cannot pass muster." J.A. 230.

Applying strict scrutiny, the district court enjoined the Act's recall provision because it thought a truthful description of a voluntary recall would violate the Act and

6

because it concluded that such a description could not mislead consumers. It next found the Act's consumer alert provision unconstitutional, concluding that the "handful of investigations and reports" proffered by the State could not justify the provision—and that even if they could, the State had no authority to "censor under the First Amendment based on a 'fear that people would make bad decisions if given truthful information.'" J.A. 231 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011)). Though the district court did not specifically address the Act's logo provision, it permanently enjoined that provision as well. And it finally suggested that the State had failed to consider less restrictive alternatives, as required for a statute to survive strict scrutiny. J.A. 232.

As to the disclosure provisions, the district court noted that "compelled disclosure of commercial speech complies with the First Amendment if the information in the disclosure is reasonably related to a substantial governmental interest and is purely factual and uncontroversial." J.A. 233 (quoting *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019)). Nonetheless, it held that the disclosure provisions were invalid. The provision which states that a patient should not stop taking medications without a doctor's advice, qualified in the district court's view as "more professional advice and opinion" than as purely factual and uncontroversial matter. J.A. 234. Likewise, it determined that the second disclosure, which states that an FDA-approved drug or medical device remains approved by the FDA, was "not reasonably related to the State's interest," given that opioids remain approved by the FDA and that there was "little State interest in informing the public of that fact in light of the present opioid crisis." J.A. 234.

7

The district court permanently enjoined and prohibited West Virginia from enforcing the prohibitions contained in the Act as well as the disclosure requirements challenged by plaintiffs. West Virginia now appeals and we review a grant of summary judgment de novo.

## II.

We start with the Act's prohibitions. For almost two centuries, commercial speech, i.e. "expression related solely to the economic interests of the speaker and its audience," *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980), was understood to fall outside of the First Amendment's ambit. *See, e.g.*, *Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942); *Breard v. City of Alexandria*, 341 U.S. 622, 642–43 (1951). That all changed in 1976, when the Supreme Court extended the First Amendment's protections to such speech in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–62 (1976). Just four years later, *Central Hudson* set out the governing framework for analyzing commercial speech restrictions. *See* 447 U.S. at 561–66.

In doing so, *Central Hudson* recognized that the First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 563. Subsequent cases have continued to make this distinction, noting commercial speech's "subordinate position in the scale of First Amendment values" and the government's correspondingly "ample scope of regulatory authority" in the commercial speech realm. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (citation omitted). So the Supreme Court has "always been careful to distinguish commercial speech

8

from speech at the First Amendment's core." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995).

Because of its subsidiary status, commercial speech can be subjected to "modes of regulation that might be impermissible in the realm of noncommercial expression." *Fox*, 492 U.S. at 477 (citation omitted). For instance, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Central Hudson*, 447 U.S. at 563. Strict scrutiny is therefore improper when reviewing laws that regulate commercial speech. Instead, we apply the following four-part intermediate-scrutiny analysis from *Central Hudson*:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566. These four parts are "not entirely discrete"; they are all "important and, to a certain extent, interrelated," as "the answer to [one part] may inform a judgment concerning the other three." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183–84 (1999). For more than four decades, this has been the governing test for regulations of commercial speech. And "[i]t is now well established that lawyer advertising is commercial speech." *Fla. Bar*, 515 U.S. at 623.

Notwithstanding the Supreme Court's well-settled precedent, the district court applied strict scrutiny to the Act's prohibitions. Employing the proper framework for commercial speech—that of *Central Hudson*—we conclude that the Act's prohibitions

9

present no constitutional problem. The Act targets misleading speech and furthers substantial government interests in an appropriately tailored manner.

## A.

The standard of review in this case is critical. The district court, as noted, decided to "apply strict scrutiny" to the West Virginia statute. J.A. 230. In so doing it relied primarily on a line of Supreme Court cases, beginning with *Sorrell,* stating that content-based laws are subject to strict scrutiny. Because of that baseline, it saw no need to analyze the Act under *Central Hudson*. But each of these cases arose in a different context, and none of them purport to displace commercial speech doctrine. So we must follow *Central Hudson* here. We leave to the Supreme Court "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

The district court missed the import of the cases it quoted. Begin with *Sorrell*, which stated that "[i]n the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." 564 U.S. at 571; *see* J.A. 225. Yet this line must be placed within the larger context. To start, the State in *Sorrell*—unlike West Virginia here—did not contend that "the provision challenged" would "prevent false or misleading speech." *Sorrell*, 564 U.S. at 579. But even more fundamentally, *Sorrell itself* applied the *Central Hudson* framework to a concededly "content-based law." *Id.* at 571. Instead of examining whether the law was the least restrictive means to further a compelling governmental interest (which would have been classic strict scrutiny language), the Court required the State to show "that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest"—and it

10

explicitly cited *Central Hudson* for this proposition. *Id.* at 572 (citing 447 U.S. at 566). It is difficult to imagine that the Supreme Court, in consciously relying on *Central Hudson*, was actually overruling it.

*Reed* also generally stated that "[a] law that is content based on its face is subject to strict scrutiny." 576 U.S. at 165; *see* J.A. 227. However, *Reed* involved a sign code that regulated non-commercial speech. *See* 576 U.S. at 159–61 (discussing ideological signs, political signs, and signs directing the public to nonprofit gatherings). Indeed, that case concerned political speech at the heart of the First Amendment, so it never needed to mention commercial speech or any precedents in that vein. Rather than overruling long-settled precedent, *Reed* simply concerned a totally different context; it cannot be distorted to so unsettle the *Central Hudson* regime. After all, the Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

Finally, *Barr* does not suggest otherwise or "foreclose[]" the application of intermediate scrutiny. J.A. 227. While *Barr* did broadly state that "[c]ontent-based laws are subject to strict scrutiny," 140 S. Ct. at 2346, it also distinguished "impermissible content-based speech restrictions from traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech," *id.* at 2347. And *Barr* explicitly warned that it was not seeking to upset the First Amendment apple cart. *Id.* ("Our decision is not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity.").

Far from overruling *Central Hudson*, the Supreme Court has again and again indicated that it remains good law. Our court has continued to recognize as much, even after *Sorrell*. *See, e.g.*, *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014) (citing *Central Hudson* for the proposition that commercial speech receives a lower level of review); *Fusaro v. Cogan*, 930 F.3d 241, 249 (4th Cir. 2019) (citing *Stuart* for the same). Other circuits likewise continue to follow *Central Hudson*. *See, e.g.*, *Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 138 (3d Cir. 2020) ("[T]he Supreme Court has consistently applied intermediate scrutiny to commercial speech restrictions, even those that were content- and speaker-based."); *Vugo, Inc. v. City of New York*, 931 F.3d 42, 50 (2d Cir. 2019) ("*Sorrell* leaves the *Central Hudson* regime in place."); *Retail Digit. Network, LLC v. Prieto*, 861 F.3d 839, 841 (9th Cir. 2017) (en banc) ("*Sorrell* did not modify the *Central Hudson* standard.").

To be clear: Commercial speech regulations are analyzed under *Central Hudson*. Begrudgingly acknowledging this reality, plaintiffs try to suggest that the standard of review does not matter here. In support, they cite *Sorrell*'s statement that "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." 564 U.S. at 571. Crucially, though, the Supreme Court in *Sorrell* applied *intermediate* scrutiny in finding the law at issue unconstitutional, while the district court in this case applied *strict* scrutiny. As intermediate scrutiny is "less onerous" than strict scrutiny, and strict scrutiny is the "most demanding test known to constitutional law," *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (en banc), the Supreme Court in *Sorrell* could rightly say that a law failing intermediate scrutiny would also fail strict scrutiny.

12

After all, if you can't ski a blue run successfully, you obviously can't tackle a double black diamond. Yet failing to navigate a treacherous course does not imply an inability to handle a gentler slope. Likewise, that a statute fails strict scrutiny means little for how it would fare under a more lenient intermediate standard. Because the district court applied only the most demanding test here, plaintiffs' argument reflects a misunderstanding as to how standards of review are meant to operate.

## B.

Applying *Central Hudson*'s framework, we conclude that the Act's prohibitions survive constitutional scrutiny. The Act's three prohibitions target misleading speech, West Virginia has substantial interests in protecting public health and in preventing deception, and the Act advances these interests in a narrowly tailored and reasonable way.

## 1.

First, we must consider whether the Act regulates misleading speech. *Central Hudson*, 447 U.S. at 566. If advertising is misleading, it "may be prohibited entirely." *In re R. M. J.*, 455 U.S. 191, 203 (1982). Supreme Court cases "make clear that the State may ban commercial expression that is fraudulent or deceptive without further justification." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). Unquestionably, the State "may impose appropriate restrictions" on "particular content or method[s] of advertising" that are either "inherently" or "in fact" misleading. *In re R. M. J.*, 455 U.S. at 203. So at this step, we ask whether the regulated speech is inherently misleading or whether there is evidence that it is actually misleading. *W. Va. Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009).

Here, each of the Act's prohibitions targets speech that is either inherently or actually misleading. The dangers in this area are clear. Drug-related lawyer advertisements might give medically unsophisticated viewers the impression that attorneys are disinterestedly dispensing medical or governmental advice instead of actively soliciting clients. And those viewers might in response undertake a rash course of action detrimental to their health and wellbeing by promptly dropping their medications. West Virginia has merely attempted to abate these dangers.

Take the prohibitions in turn. First, the Act prohibits presenting "a legal advertisement as a 'consumer medical alert', 'health alert', 'consumer alert', 'public service health announcement', or substantially similar phrase suggesting to a reasonable recipient that the advertisement is offering professional, medical, or government agency advice about pharmaceuticals or medical devices rather than legal services." W. Va. Code § 47-28-3(a)(2). The Act thus precludes dressing up a legal advertisement as something it isn't—a public service announcement or a medical alert. It thereby explicitly targets a practice that is inherently misleading, and one which evidence shows is actually misleading. *See* Fed. Trade Comm'n, *FTC Flags Potentially Unlawful TV Ads for Prescription Drug Lawsuits* (Sept. 24, 2019) ("FTC Press Release") (Ads that open "with sensational warnings or alerts . . . may initially mislead consumers into thinking they are watching a government-sanctioned medical alert or public service announcement."); Jesse King & Elizabeth Tippett, *Drug Injury Advertising*, 18 Yale J. Health Pol'y L. & Ethics 114, 146–47 (2019) (finding "clear evidence that deceptive drug injury advertisements are likely to be misidentified" as public service or government announcements).

14

Next, the Act prohibits displaying a government logo "in a manner that suggests affiliation with the sponsorship of that agency." W. Va. Code § 47-28-3(a)(3). Suggesting affiliation with the sponsorship of a government agency where none exists is inherently deceptive, as it is in no way truthful to suggest that private attorney advertisements have "the sponsorship" of the government. To their credit, plaintiffs do not argue otherwise.

The Act's final prohibition disallows using "the word 'recall' when referring to a product that has not been recalled by a government agency or through an agreement between a manufacturer and government agency." *Id.* § 47-28-3(a)(4). As "recall" is a loaded term that brings to mind substantial government involvement, the Act prohibits lawyers from using the word when there is in fact little or no government involvement. It is entirely reasonable for the West Virginia legislature both to conclude that "recall" would make consumers think that a government entity was responsible, and to decide that attorney advertising which conveys that false impression would mislead its citizens about the safety of medications or medical devices. And there is evidence confirming the legislature's judgment that "recall" is actually misleading. *See, e.g.*, FTC Press Release (noting that attorney advertisements "could leave consumers with the false impression that their physician-prescribed medication has been recalled"); U.S. Chamber Inst. for Legal Reform, *Bad for Your Health: Lawsuit Advertising, Implications and Solutions* (Oct. 2017), at 28 ("*Bad for Your Health*") (noting testimony of Dr. W. Frank Peacock that a legal advertisement persuaded a highly educated patient to discontinue use of a blood thinning medication, even though it remained very safe and effective).

15

Plaintiffs argue that the Act prohibits the word "recall" even where an attorney advertisement truthfully indicates that a drug or device has been recalled by the manufacturer. They give the example of Zantac, where the FDA asked manufacturers to withdraw the product from the market and the manufacturers then complied with the FDA's request. Noting that FDA regulations state that a "[r]ecall is a voluntary action" that "may be undertaken voluntarily and at any time by manufacturers . . . or at the request of the [FDA]," 21 C.F.R. § 7.40(a)–(b), plaintiffs conclude that the Act bans the use of the word "recall" in this situation. They also raise other hypotheticals: where a manufacturer refuses to withdraw its product after an FDA request, or where a manufacturer voluntarily removes its product from the market.

At the outset, the Act actually allows the word "recall" in the Zantac scenario. As the State conceded at oral argument, the Act would not prohibit describing what happened with Zantac as a "recall." Oral Arg. at 41:57–42:31. If the FDA has made a request for a recall and the manufacturer complies, then there has been an "agreement between a manufacturer and government agency." W. Va. Code § 47-28-3(a)(4). The Act does not define what an "agreement" is and, as the State notes, the phrase on its face encompasses agreements of an informal nature. The concerns animating the recall prohibition—that consumers would think that the government is involved when it is not, or would think that the products are more dangerous than they are—are not present in the same way where the government makes a request for the product to be withdrawn and the manufacturer complies. Attorney advertisements are therefore free to describe an FDA request followed by manufacturer compliance as a "recall."

16

As to the scenarios of manufacturer refusal or voluntary withdrawal, plaintiffs overlook the fact that objectively truthful speech can still be misleading. Even assuming, then, that the Act prohibits the use of the word "recall" in these situations, we see no constitutional infirmity here. We think it unlikely that individuals will carefully parse the extent of the government's involvement when they hear the word "recall." Precisely because the regulatory meaning of "recall" might not fully align with the ordinary meaning that a consumer would assign, West Virginia seeks to prevent the mistaken assumptions arising from this mismatch.

Even though attorneys may not use the word "recall" in these situations, they are not prohibited by the Act from explaining truthfully the circumstances of a drug's removal from the market. Suppose, for example, plaintiffs were to say that "the drug's manufacturer refused to comply with an FDA request to take this product off the market." Or suppose they were to state that a manufacturer "has voluntarily withdrawn this medical device after discovering health and safety concerns." We need not pass on all the different hypothetical statements that might arise, because such cases are not before us. Suffice it to note that statements such as the above would present a controversy that is different from the case at bar.

One can imagine multiple ways to accurately describe what has happened without relying on the troublesome word "recall." That West Virginia requires plaintiffs to make use of available alternatives instead of resorting to the loaded (and potentially misleading) shorthand plaintiffs prefer seems to us eminently reasonable. It also means that manufacturers are incentivized to freely remove defective drugs on their own, without

17

worrying that the word "recall" will be plastered all over an advertisement and convey the misleading impression that the government has pulled the medication off the market. Again, attorney advertisements are not shut down—the ads just cannot use the word "recall" in limited and potentially misleading contexts.

2.

Next we ask whether the government interest justifying the Act is "substantial." *Central Hudson*, 447 U.S. at 566. The Supreme Court in *Central Hudson* noted that commercial speech "at least must concern lawful activity and not be misleading" to come within the First Amendment's protections. *Id.* We have concluded that West Virginia targets misleading speech through the Act, and so we likely need proceed no further. Out of a sense of caution, however, we take up the remainder of the *Central Hudson* analysis.

In that connection, we note that West Virginia has two substantial interests in this case: protecting public health and preventing deception. First, the Act implicates the State's fundamental interest in protecting public health because it prevents medical mishaps arising out of misleading lawyer advertising. This is a canonical state interest; West Virginia unquestionably has a "compelling interest in assuring safe health care for the public." *Varandani v. Bowen*, 824 F.2d 307, 311 (4th Cir. 1987). Ensuring the health and safety of West Virginia's residents is crucial to the State's police power, and West Virginia has broad authority to regulate in this domain.

Second, and relatedly, the State has a substantial interest in protecting its citizens from deception when it comes to medical issues. As we have already discussed, the Act implicates this interest because it specifically targets words and phrases that are actually or

18

inherently misleading. And one need only watch a single thirty-second television advertisement for a new medication, or merely peek inside the medicine cabinet, to realize that accurate information about medications and their side effects is of the utmost importance. The extensive regulation surrounding the public discussion of the ever-proliferating number of prescriptions and medications indicates that communications in this area must be handled with the greatest care.

Plaintiffs counter that the State's asserted interests merely repeat the losing arguments from *Sorrell*. True, in *Sorrell*, Vermont asserted a public-health justification that the Supreme Court found unavailing. *See* 564 U.S. at 576–79. But that was because the whole premise of the challenged law was that the regulated speech—which the State admitted was completely truthful—was *too* persuasive. *Id.* at 577–78. And that's why, where Vermont did not argue that the challenged law would prevent false or misleading speech, its attempt to regulate "turn[ed] on nothing more than a difference of opinion." *Id.* at 579. Not so here. West Virginia *has* argued that the Act would prevent misleading speech, and it is not trying to regulate the advertisements in question merely because they are persuasive. The Act does not prohibit attorneys in West Virginia from using advertisements to convince potential clients to sue, just as before. But it does disallow attorneys from spreading misleading information that may well cause viewers to take drastic actions that negatively affect their health.

Over a century ago, the Supreme Court paid heed to West Virginia's interests in protecting public health and preventing deception as to medical issues when it upheld West Virginia's medical licensing requirements. *See Dent v. West Virginia*, 129 U.S. 114, 122–

19

23 (1889). The State here justifiably asserts the same interests, and we have no trouble in concluding that those interests are substantial.

3.

Finally, we address the last two steps of *Central Hudson* to ask whether the Act "directly advances" West Virginia's substantial interests in a way that is "not more extensive than is necessary" to serve those interests. 447 U.S. at 566. As to direct advancement, West Virginia's burden "is not satisfied by mere speculation or conjecture"; instead, the State "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71. Yet there is no requirement that "empirical data come . . . accompanied by a surfeit of background information." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quoting *Fla. Bar*, 515 U.S. at 628). Rather, the State may "justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether"—or even "based solely on history, consensus, and simple common sense." *Id.* (quoting *Fla. Bar*, 515 U.S. at 628) (internal quotation marks omitted).

The extensiveness prong "complements" the direct-advancement inquiry. *Greater New Orleans Broad. Ass'n*, 527 U.S. at 188. Here, the State "is not required to employ the least restrictive means conceivable." *Id.* Instead, there needs to be a "fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs . . . a means narrowly tailored to achieve the desired objective." *Fox*, 492 U.S. at 480 (internal

quotation marks and citations omitted). Because it is difficult to "establish[] with precision the point at which restrictions become more extensive than their objective requires," this standard gives the State "needed leeway in a field (commercial speech) traditionally subject to governmental regulation." *Id.* at 481 (internal quotation marks omitted).

The Act's prohibitions plainly pass this test. As previously noted, each prohibition targets particular misleading words or images in order to protect public health and prevent citizens from taking misguided medical actions based on attorney advice. The State wants to ensure that viewers understand that attorneys are engaging in legal solicitation, not tendering medical advice with the government's imprimatur. Preventing inherently misleading uses of phrases like "medical alert" or "public service health announcement," misleading words like "recall," and misleading uses of images that suggest government "sponsorship," directly advances that goal—as studies and anecdotes confirm. And the fit here is narrowly tailored and reasonable. The Act does not strip attorneys of the ability to advertise. It does not presume to dictate what attorneys can say about their legal services, but instead reaches misleading statements about drugs or devices that might give rise to a lawsuit. It does not affect other industries or activities, but instead focuses on a particular problem. Really, the Act does not ask for much, but instead requires that attorneys present themselves truthfully as attorneys when they advertise.

Plaintiffs argue that West Virginia introduced no evidence that misleading lawyer advertising is a real (rather than hypothetical) problem in West Virginia. This of course ignores that intermediate scrutiny permits evidence "pertaining to different locales." *Fla. Bar*, 515 U.S. at 628. But it also overlooks the "studies and anecdotes," *id.*, that the State

21

did put forward to show both that attorney advertisements involving medications or medical devices can and do mislead viewers—and that attorneys often use the precise tactics that the State prohibits in the Act. Ominous warnings or alerts may lead viewers to think that an attorney advertisement conveys impartial medical information. *See, e.g.*, FTC Press Release; King & Tippett, *supra*, at 146–47; *Bad for Your Health*, *supra*, at 10 (providing visual example). Using government logos to suggest sponsorship can do the same. *See, e.g.*, Leah Miller, AARP, *Don't Confuse Lawsuit Ads That Look Like Public Service Announcements* (Mar. 21, 2018) (noting that "bad drug" advertisements often "feature altered logos of government agencies like the Food and Drug Administration"); *Bad for Your Health*, *supra*, at 13 (providing visual examples). And the misleading use of the word "recall" can lead to similar problems. *See, e.g.*, FTC Press Release. To prevent these specific misperceptions by the audience—and the misguided courses of action that might spring from them—the State has prohibited these specific practices by attorneys.

That West Virginia already has existing restrictions on lawyer advertising is similarly no reason to find that the Act's prohibitions fail intermediate scrutiny. As we have reasoned before, a statute "must stand or fall on its own merits, independent of whether it overlaps with other parts of [West Virginia's] legal landscape. The judgment we have to make is whether *this* Act is or is not a constitutional one. And all the duplication in the world would not by itself condemn it." *Wash. Post v. McManus*, 944 F.3d 506, 523 (4th Cir. 2019). It is also not clear that these prohibitions are in fact duplicative. The Act's requirement of a one-line disclaimer that "this is a legal advertisement," placed in fine print, may not have seemed sufficient to prevent the specific mischief that West Virginia

seeks to avert. The legislature reasonably concluded that more was necessary in this situation, where the public-health consequences are substantial.

Plaintiffs next contend that West Virginia failed to "consider alternatives to regulating speech to achieve its ends," *Musgrave*, 553 F.3d at 305, suggesting that the State should undertake an "educational campaign[] focused on the problems" here instead of resorting to the Act's prohibitions, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996). Yet it is difficult to visualize what this imagined campaign would look like. After all, the State is not regulating speech to convey a different message. Instead, it seeks to ensure that the information others communicate is truthful and not misleading. We thus doubt that a public-awareness campaign "might prove to be more effective" than the Act's prohibitions. *Id.* at 507. It is much more likely that misleading speech would wipe out the potential benefits of such a campaign.

West Virginia has chosen fitting means to prevent misleading speech. To achieve *this* end, it properly elected to enact the prohibitions that it did. And West Virginia is not out on a limb in doing so. In fact, two other States have passed nearly identical legislation, and several others have considered similar laws in recent legislative sessions. *See* Tex. Gov't Code § 81.153; Tenn. Code § 47-18-3002; *see also* Fla. S.B. 1992 (2021); Kan. S.B. 150 (2021); Ky. S.B. 20 (2021); La. S.B. 43 (2021).

Finally, plaintiffs argue that the alert and logo provisions are vague because they fail to provide fair notice as to which phrases are "substantially similar" or which logos suggest "sponsorship." But a law is not void for vagueness so long as it "(1) establishes minimal guidelines to govern law enforcement, and (2) gives reasonable notice of the

23

proscribed conduct." *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998) (internal quotation marks omitted). That some smidgen of ambiguity remains is no reason to find a statute unconstitutionally vague. *United States v. Chong Lam*, 677 F.3d 190, 202 (4th Cir. 2012).

The Act does establish minimal guidelines and give reasonable notice: it makes clear specific terms the State has deemed misleading and why. And language like "suggesting an affiliation" or "substantially similar" has been upheld by other courts in the face of vagueness challenges. *See, e.g.*, *United States v. Johnson*, 626 F.3d 1085, 1090 (9th Cir. 2010) ("evidences [an] affiliation"); *United States v. Demott*, 906 F.3d 231, 237 (2d Cir. 2018) ("substantial similarity"). We see no vagueness problem here, just run-of-the-mill statutory phrases.

In short, we hold that the Act's prohibitions are subject to *Central Hudson*'s intermediate scrutiny. Applying that standard, we conclude that the prohibitions pose no constitutional problem. We thus reverse the district court's holding that the Act's prohibitions violate the First Amendment.

III.

We turn now to the Act's disclosure requirements. The Supreme Court has made clear that there are "material differences between disclosure requirements and outright prohibitions on speech." *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985). After all, as the Court noted, the "constitutionally protected interest in *not* providing any particular factual information in . . . advertising is minimal." *Id.*; *see also* Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 877 (2015) ("Because the

24

constitutional value of commercial speech lies in the circulation of information, restrictions on commercial speech and compulsions to engage in commercial speech are constitutionally asymmetrical" and mandatory disclosures "may even enhance" the "constitutional purpose of commercial speech doctrine."). So, while prohibitions on commercial speech must pass the test articulated in *Central Hudson*, *Zauderer* held that laws requiring advertisers to disclose "purely factual and uncontroversial information" are permissible as long as the disclosure requirements are "reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651.

To reiterate, plaintiffs challenge two disclosure requirements here. Both apply only to advertisements made "in connection with a prescription drug or medical device approved by the U.S. Food and Drug Administration." W. Va. Code § 47-28-3(b)(1), (b)(2). The subsection (b)(1) disclosure requires that such advertisements include the language: "Do not stop taking a prescribed medication without first consulting with your doctor. Discontinuing a prescribed medication without your doctor's advice can result in injury or death." *Id.* § 47-28-3(b)(1). And the subsection (b)(2) disclosure requires that advertisers "disclose that the subject of the legal advertisement remains approved by the U.S. Food and Drug Administration, unless the product has been recalled or withdrawn." *Id.* § 47-28-3(b)(2).

Here, the district court properly noted that *Zauderer* generally applies to the mandatory disclosure of commercial speech. But it invalidated the disclosure requirements anyway, concluding that they were not sufficiently factual and uncontroversial for

*Zauderer*'s reasonable relation test to apply and, in any event, that they failed this deferential test. We disagree on both counts.

A.

Initially, as we have made clear, *Zauderer* applies to the disclosure requirements. In that case, which also concerned the regulation of attorney advertisements, the Court observed that the State had merely required the disclosure of "purely factual and uncontroversial information about the terms under which [the attorney's] services will be available," 471 U.S. at 651, and it is within this context that *Zauderer*'s reasonable relation test applies. Recently, in *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361 (2018), the Supreme Court cautioned against applying *Zauderer* to disclosures that "in no way relate[]" to the services being offered or that compel speech on hotly contested topics. *Id.* at 2372. There, the Court declined to apply *Zauderer* to a state statute that required private medical clinics to post information about entirely unrelated "state-sponsored services—including abortion, anything but an 'uncontroversial' topic." *Id* (emphasis omitted). At the same time, the Court underscored that it did not "question the legality of health and safety warnings long considered permissible." *Id.* at 2376.

This case is far from the boundary line staked out by *NIFLA*. Unlike in that case, the disclosure requirements here are directly targeted at promoting the State's interest "in dissipat[ing] the possibility of consumer confusion or deception." *Zauderer*, 471 U.S. at 651 (quoting *In re R. M. J.*, 455 U.S. at 201). And they do so by providing information directly connected to the subject of the advertisement, rather than by compelling speech concerning unrelated or competing services. Moreover, the requirements here are just the

26

sort of "health and safety warnings" that have been "long considered permissible." *NIFLA*, 138 S. Ct. at 2376. The only question, then, is whether these required disclosures are "factual and uncontroversial." *Zauderer*, 471 U.S. at 651. We conclude that they are.

1.

Begin with subsection (b)(1). That provision, taken as a whole, requires attorneys to inform their audience that discontinuing medications without medical advice "can result in injury or death" and that viewers or listeners should not discontinue a prescribed medication without first consulting their doctors. W. Va. Code § 47-28-3(b)(1). This is factual and uncontroversial information: it is well known, after all, that suddenly discontinuing certain medications can cause injury or death, and plaintiffs do not dispute this point. And given this context, the disclosure that patients should consult with their doctor before discontinuing medication simply communicates to the audience the factual and uncontroversial point that the advice of a physician mitigates this risk of injury or death.

The district court came to a different conclusion. Taking the first sentence of subsection (b)(1) in isolation, it determined that advising patients to consult their doctors before discontinuing a prescription medication qualified as "more professional advice and opinion than purely factual or uncontroversial." J.A. 234. But reading that sentence on its own cleaves the disclosure in half. The statement that patients should consult with their doctor is no freestanding admonition but merely the first half of a two-sentence disclosure. It is immediately followed by the statement that abruptly discontinuing medications may result in injury or death. In this context, the implied message becomes clear. Just telling a

patient that discontinuing a drug may result in injury or death without medical advice very naturally invites the follow-up question, "How may I avoid that outcome?" The first sentence of subsection (b)(1) supplies the factual and uncontroversial answer: "You may reduce the risk by consulting with your doctor."

In any event, the district court proceeded from a mistaken premise, as a statement framed as an instruction can still be factual and uncontroversial. Is there really any difference between a recipe that says "Bake at 425 degrees for 35 minutes" and one that says, "The pie will be undercooked if you bake it for much less than 35 minutes and overcooked if you bake it for much longer"? Of course, instructions may turn out to be opinionated or non-factual on closer examination. But not always, and it is the communicative content of the message, rather than the format, that is dispositive. A sentence framed as "an instruction rather than a direct factual statement" may be factual and uncontroversial where it "clearly implies a factual statement" that is true. *CTIA*, 928 F.3d at 847 (applying *Zauderer* to uphold the required disclosure, "Refer to the instructions in your phone or user manual for information about how to use your phone safely."). That is precisely the case here.

2.

As to the subsection (b)(2) requirement, the analysis is straightforward. To repeat, advertisements must "disclose that the subject of the legal advertisement remains approved by the U.S. Food and Drug Administration, unless the product has been recalled or withdrawn." W. Va. Code § 47-28-3(b)(2). If an FDA-approved prescription drug has not been recalled or withdrawn, it is indisputably the case that the drug remains approved by

28

the FDA. W. Va. Code § 47-28-3(b)(2); *see also* 21 C.F.R. § 314.150 (requiring products to be withdrawn from the market where the FDA revokes approval). And while the district court noted that whether to disclose this fact may be "the subject of controversy" in some cases, J.A. 234, this reasoning misinterprets *Zauderer*. The question is not whether the *existence* of a given disclosure requirement is controversial; any time there is litigation over a disclosure requirement, there is, by definition, a "case" or "controversy" concerning that requirement. *See* U.S. Const. art. III, § 2, cl. 1. Rather, the question is whether the *content* of a required disclosure is controversial. *See Zauderer*, 471 U.S. at 651 (referencing "purely factual and uncontroversial *information*" (emphasis added)). And the statement that an FDA-approved drug remains approved strikes us as entirely anodyne.

B.

Under *Zauderer*, we next assess whether the disclosure requirements are reasonably related to the State's interest in preventing consumer deception. This standard is not toothless, since requirements cannot be "unjustified or unduly burdensome," *Zauderer*, 471 U.S. at 651, and since the disclosures must remedy a harm that is "potentially real not purely hypothetical," *NIFLA*, 138 S. Ct. at 2377 (quoting *Ibanez v. Fla. Dep't of Bus. & Pro. Regul.*, 512 U.S. 136, 146 (1994)). But the standard remains deferential, in keeping with the "minimal" interest that advertisers have in refraining from "providing any particular factual information." *Zauderer*, 471 U.S. at 651.

In the context of attorney advertisements concerning medical devices or prescription drugs, the State's interest in preventing deception of consumers is undeniably strong. As the State notes and as we have discussed, studies indicate that consumers may indeed be

29

confused by such advertisements and may mistake them for medical advice. *See* Appellant's Opening Br. at 31 (citing King & Tippett, *supra*, at 144). In other cases, patients may mistakenly believe that a product has been recalled when it in fact remains approved for public use. *See* FTC Press Release.

Moreover, unlike with many products, the consequences of consumer confusion in this context may be grave. Patients who stop using a medication cold turkey and without the advice of their physician may unwittingly be taking great risks. In some cases, the patient may even die. *See* King & Tippett, *supra*, at 128 n.84 (noting a study that found two deaths after patients stopped taking medication in response to attorney advertisements). In this arena, then, the State's interest in preventing consumer deception, as identified by the Supreme Court in *Zauderer*, overlaps with its interest in "furthering public health and safety." *CTIA*, 928 F.3d at 844.

Against all this, the district court suggested that in some circumstances mandatory disclosures may not be beneficial, questioning whether it would further the State's interest to remind patients that opioids remain approved by the FDA. Plaintiffs likewise argue that the attorney advertisements at issue may not be misleading in all cases and that, even if they were, mandatory disclosures might not best solve the problem. But it is not our task to assess the validity of the studies relied upon by the State or to make an empirical judgment as to whether mandatory disclosures are the most appropriate remedy. These are questions quintessentially reserved to the political branches, an assignment of responsibility that *Zauderer*'s deferential standard emphatically reinforces. Nor do we think that the State fails the reasonable relation test simply because there might conceivably

be some individual instance in which mandatory disclosures arguably produce more harm than good. West Virginia is free to come to its own conclusions as to the value of disclosure requirements amid the ongoing opioid crisis. It acted well within its authority in determining that a policy of mandatory disclosures would, on the whole, best serve the State's interests.

Finally, plaintiffs argue that the disclosure requirements, considered in their entirety, are "unjustified or unduly burdensome." *NIFLA*, 138 S. Ct. at 2377 (quoting *Zauderer*, 471 U.S. at 651). The Supreme Court has applied this standard where the only asserted justification for a disclosure requirement is "purely hypothetical." *See id.*; *Ibanez*, 512 U.S. at 146–47. And the Court has also indicated that a requirement should extend "no broader than reasonably necessary," *NIFLA*, 138 S. Ct. at 2377 (quoting *In re R. M. J.*, 455 U.S. at 203), so courts have overturned requirements mandating that a large fraction of the advertisement be dedicated to the disclosure, *see Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019), or that make the relevant advertisement functionally impossible, *see Ibanez*, 512 U.S. at 146–47.

The disclosure requirements here pose no such issue. In response to concrete concerns supported by empirical evidence, West Virginia imposes relatively benign burdens on attorneys. First, the Act mandates commonplace disclosures clarifying the nature and identity of the advertisements at issue, requirements that plaintiffs do not specifically challenge. And second, the Act requires two or three short sentences informing patients that they should not discontinue a drug without consulting a doctor, that discontinuing a drug may be hazardous, and, if applicable, that the drug remains FDA

31

approved. This limited intrusion into a given advertisement is entirely commonplace. Rare is the radio listener or television viewer who has not sat through far more voluminous warnings and disclosures than those mandated here.

In short, we conclude that the disclosure requirements at issue here are subject to *Zauderer* and that they easily pass the deferential standard articulated by that case. We therefore reverse the district court's holding that these requirements violate the First Amendment.

IV.

Plaintiffs try to transfigure the Act into a sweeping and draconian enactment. But all West Virginia requires is that attorneys truthfully present themselves as attorneys. The Act's prohibitions and disclosures work together to accomplish this end—and to protect the health of West Virginia citizens who may be misled into thinking that attorneys are reliable sources of medical advice. The Act survives constitutional challenge. We thus reverse the judgment of the district court and remand the case with directions that it be dismissed.

*REVERSED AND REMANDED*
*WITH DIRECTIONS TO DISMISS*